RETROPHIN, INC., Plaintiff,

v.

QUESTCOR PHARMACEUTICALS, INC., Defendant.

Case No. SACV 14–26–JLS (JPRx).

United States District Court, C.D. California.

Signed Aug. 8, 2014.

Tami Kameda Sims, Katten Muchin Rosenman LLP, Los Angeles, CA, James J. Calder, Mark T. Ciani, Katten Muchin Rosenman LLP, New York, NY, for Plaintiff.

John F. Cannon, Stradling Yocca Carlson and Rauth PC, Newport Beach, CA, Mark S. Popofsky, Ropes & Gray LLP,

Washington, DC, Rocky C. Tsai, Ropes & Gray LLP, San Francisco, CA, for Defendant.

## ORDER DENYING MOTION TO DISMISS (Doc. 21)

JOSEPHINE L. STATON, District Judge.

## I. INTRODUCTION

Before the Court is Defendant Questcor Pharmaceuticals, Inc.'s Motion to Dismiss. (Mot., Doc. 21.) Plaintiff Retrophin, Inc. opposed, and Questcor replied. (Opp'n, Doc. 25; Reply, Doc. 26.) Having considered the parties' briefing, heard oral argument, and taken the matter under submission, the Court DENIES Questcor's Motion.

## II. BACKGROUND

When ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 130 S.Ct. 983, 986–87, 175 L.Ed.2d 943 (2010). Retrophin is a biopharmaceutical company. (Compl. ¶ 11, Doc. 1.) Questcor is the sole provider in the United States of approved therapeutic preparations of adrenocorticotropic hormone ("ACTH"), a drug used to treat certain life threatening and often fatal diseases. (*Id.* ¶ 1.) Questcor's ACTH drug is sold under the brand name H.P. Acthar Gel ("Acthar"). (*Id.*)

### A. Acthar and Relevant Markets

Acthar is the only long-acting ACTH therapeutic drug approved by the Food and Drug Administration for use in the United States. (*Id.* ¶ 3.) It is the most effective and dominant first-line of treatment for Infantile Spasms. (*Id.*) Questcor has obtained "Orphan Drug Designation" for Acthar from the FDA, giving it the exclusive right to market Acthar and its chemical equivalent for use in treating Infantile Spasms. (*Id.*) Acthar is also the most commonly used treatment of last resort for patients suffering from Nephrotic Syndrome—in other words, it is used when patients do not respond to or cannot tolerate other therapies. (*Id.*)

In 2001, Questcor acquired the rights to Acthar, at which time the drug was being sold for $50 a vial or less. (*Id.* ¶ 2.) Since acquiring Acthar, Questcor has raised the price to $28,000 a vial. (*Id.*)

Retrophin alleges that Questcor has monopoly power in the following three markets: (1) ACTH therapeutic drugs, for which Questcor "effectively has 100% of the market," (*id.* ¶¶ 19–24, 37–39); (2) therapeutic drugs to treat Infantile Spasms, for which Questcor has "more than 50%" of the market (*id.* ¶¶ 25–29, 40–42); and (3) last resort therapeutic drugs to treat Nephrotic Syndrome, for which no specific market share is alleged, but for which Acthar is alleged to be the "primary and dominant" treatment. (*Id.* ¶¶ 30–34, 43–45.) Each market is geographically limited to the United States. (*Id.* ¶¶ 24, 29, 34.) The Court refers to these three markets collectively as the "Relevant Markets."

### B. Questcor's Acquisition of Rights to Synacthen

Novartis AG holds rights to Synacthen, an ACTH drug that is similar, but not chemically identical, to Acthar. (*Id.* ¶¶ 4, 46.) Unlike Acthar, Synacthen is synthetically manufactured, and as a result Synacthen is less expensive to manufacture, is less susceptible to variation, and is produced in a more sterile environment. (*Id.* ¶ 47.) Synacthen has been used for decades outside of the United States for the successful treatment of Infantile Spasms and Nephrotic Syndrome. (*Id.* ¶¶ 4, 46, 59.) Synacthen is not sold in the United

States because it has never been submitted to the FDA for approval. (*Id.* ¶¶ 4, 46.)

Retrophin planned to purchase rights from Novartis to manufacture and sell Synacthen in the United States, and to seek FDA approval for its use as a therapeutic. (*Id.* ¶ 48.) Retrophin intended to compete in the Relevant Markets with Questcor by selling Synacthen at a fraction of the price charged by Questcor for Acthar. (*Id.*) Following approximately nine months of negotiations, Retrophin and Novartis agreed on terms for Retrophin to acquire rights to Synacthen. (*Id.* ¶ 49.) In anticipation of the transaction, Retrophin prepared specific plans on how to obtain regulatory approval of Synacthen, and put in place a clinical apparatus to conduct clinical trials necessary for FDA approval. (*Id.* ¶¶ 50, 51.) Retrophin believed that the history of Synacthen's use in other countries would aid in obtaining FDA approval for the same indications. (*Id.* ¶ 50.)

On June 11, 2013, the day Retrophin and Novartis were set to sign their proposed agreement, Questcor "swept in" and acquired the rights to Synacthen. (*Id.* ¶¶ 53–54.) Retrophin alleges that Questcor's acquisition of Synacthen has preserved and entrenched Questcor's monopoly in the Relevant Markets by foreclosing or delaying Retrophin's entry into those markets. (*Id.* ¶¶ 52, 56.)

## C. Retrophin's Development of RE–034

Retrophin has also taken the "highly unusual step of trying to create from scratch a drug—that it has designated as RE–034—that will match Synacthen." (*Id.* ¶ 57.) "Retrophin is endeavoring to create a new formulation of the drug that will incorporate the same active pharmaceutical ingredient used in Synacthen and match Synacthen's therapeutic effects for patients suffering from Infantile Spasms and Nephrotic Syndrome." (*Id.* ¶ 57.) The development of RE–034 "will take substantial time and money and will require FDA approval;" it will also require the successful completion clinical trials. (*Id.* ¶ 58.) There is no guarantee that RE–034 will succeed in the clinical trials or succeed in obtaining FDA approval. (*Id.*) Thus, there is no guarantee RE–034 will ever be able to enter the Relevant Markets. (*Id.*) Entering the Relevant Markets through RE–034 is more difficult, risky, and time consuming than entering through Synacthen, because there are decades of clinical data from outside the United States that can be used to facilitate and speed the regulatory approval process in the United States, whereas for RE–034 "Retrophin will need to develop all of that knowledge from scratch." (*Id.* ¶¶ 58–60.)

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

When evaluating a Rule 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party. *See Moyo v. Gomez,* 32 F.3d 1382, 1384 (9th Cir.1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but

it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir.2011). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Moreover, the Supreme Court has cautioned against permitting antitrust cases to proceed to discovery without a plaintiff demonstrating "plausibility" because of the high cost of discovery in antitrust cases in particular. *See Twombly,* 550 U.S. at 558, 127 S.Ct. 1955 ("Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.") (internal citation omitted).

## IV. DISCUSSION

Questcor moves to dismiss Retrophin's Complaint under Federal Rule of Civil Procedure 12(b)(6) based on the following arguments: (1) Retrophin lacks antitrust injury and antitrust standing; (2) Retrophin fails to allege market power or harm to competition; (3) Retrophin's attempted monopolization claim fails; (4) Retrophin fails to allege the absence of a legitimate business justification by Questcor; and (5) Retrophin's state-law claims fail. (Mem.,

Doc. 22.) In support of its Motion, Questcor requests that the Court take judicial notice of or otherwise consider a substantial number of documents outside the pleadings. The Court first addresses Questcor's requests for the Court to consider these documents. The Court next addresses whether Retrophin sufficiently alleges antitrust injury and antitrust standing. The Court then addresses Questcor's arguments regarding market power, harm to competition, attempted monopolization, and lack of legitimate business justification. Finally, the Court addresses Retrophin's state-law claims.

### A. Requests for Judicial Notice and Matters Outside the Pleadings

■ "As a general rule, [courts] may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *U.S. v. Corinthian Colleges,* 655 F.3d 984, 998 (9th Cir.2011) (citation and quotation marks omitted). "[Courts] may, however, consider materials that are submitted with and attached to the Complaint." *Id.* at 999 "[Courts] may also consider unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.* (citation omitted). "Pursuant to Federal Rule of Evidence 201, [courts] may also take judicial notice of matters of public record, but not of facts that may be subject to reasonable dispute. More specifically, [courts] may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to [a defendant] that could reasonably be disputed." *Id.*

Questcor asks the Court to take judicial notice of or otherwise consider the following documents: (1) "Retrophin's RE–034 Conference Call" presentation and a tran-

script of the conference call; (2) two press releases by Retrophin, one titled, "Retrophin Unveils New Clinical Development Candidate RE–034, An ACTH Analog," and the other titled, "Retrophin Announces Public Offering of Common Stock;" (3) SEC filings by Retrophin and Questcor; (4) a blog post by Retrophin's CEO; (5) a transcript of statements Retrophin's CEO made at a conference; and (6) FDA publications in the Federal Register. (Popofsky Decl. Exs. A–K, Doc. 23; Mem. at 13–14.)

These documents are not attached to the Complaint. Nor does the Complaint mention any of the documents, and the Court does not find them "central" to Retrophin's claims. *See U.S. v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003). Moreover, to the extent any of the documents are subject to judicial notice, Questcor improperly asks the Court to take judicial notice of the documents for facts that could be reasonably disputed. Accordingly, with the exception of the FDA publications in the Federal Register, the Court will not consider these documents when ruling on the motion.

## B. Antitrust Standing

■■■ Questcor challenges whether Retrophin sufficiently alleges antitrust injury and antitrust standing. (Mem. at 8–17.) Retrophin's claims for violation of sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act all seek damages under section 4 of the Clayton Act and injunctive relief under section 16 of the Clayton Act. (Compl. ¶¶ 71, 78, 83; *id.* at 20.) In order for a private plaintiff to obtain damages and injunctive relief under sections 4 and 16 of the Clayton Act, the plaintiff must

have antitrust standing. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488–489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Several factors bear on whether a plaintiff has antitrust standing:

1. the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;
2. the directness of the injury;
3. the speculative measure of the harm;
4. the risk of duplicative recovery; and
5. the complexity in apportioning damages.

*Am. Ad Mgmt. Inc. v. Gen. Tel. Co. of California,* 190 F.3d 1051, 1054 (9th Cir. 1999). A showing on the first factor—antitrust injury—"is necessary, but not always sufficient, to establish standing under [section] 4 [of the Clayton Act]." *Id.* at 1055 (quotation marks omitted).[1] As to the remaining factors, Plaintiff need not make a showing on each; instead, the factors are balanced. *See id.*

### 1. Antitrust Injury

■■■ Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 484, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (deciding "narrow" issue of "whether antitrust damages were available where the sole injury alleged is that competitors were continued in business, thereby denying [plaintiffs] an anticipated increase in market shares."). *See*

---

1. "[Section] 4 requires a plaintiff to show actual injury, but [section] 16 requires a showing only of 'threatened' loss or damage[.]" *Cargill,* 479 U.S. at 111, 107 S.Ct. 484. Because the Court finds Retrophin has met its burden under section 4 of the Clayton Act, Retrophin also meets its burden under section 16.

*also Cargill,* 479 U.S. at 116, 107 S.Ct. 484 ("*Brunswick* holds that the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws.").

Questcor argues that Retrophin cannot demonstrate antitrust injury under *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.,* 140 F.3d 1228, 1233 (9th Cir.1998). (Mem. at 9–10.) In *Lucas,* the plaintiff Lucas Automotive Engineering and one of the defendants, Coker Tire Company, both competed in markets for the sale of vintage automotive tires. *Lucas,* 140 F.3d at 1230. Coker outbid Lucas for the rights to manufacture and distribute tires for a third party; Lucas challenged Coker's winning bid in part under section 2 of the Sherman Act and section 7 of the Clayton Act. *Id.* at 1230–31. The district court granted summary judgment in favor of Coker, noting that there was no evidence Coker had raised prices. *Id.* at 1231. Applying *Brunswick,* the Ninth Circuit affirmed, holding that Lucas lacked standing as a competitor to challenge Coker's winning bid because Lucas "would have suffered the same injury had a small business acquired the exclusive right to manufacture and to distribute [the] tires." *Id.* at 1233, 1235.

The Ninth Circuit distinguished *Lucas* and *Brunswick* in *Glen Holly Entertainment, Inc. v. Tektronix Inc.,* 352 F.3d 367 (9th Cir.2003). In *Glen Holly,* the plaintiff alleged that the only two competitors in a market agreed that one would stop selling its products and become the distributor of the other. *Id.* at 369. In reversing the district court's dismissal of the plaintiff's antitrust claims at the pleading stage for lack of antitrust injury, the Ninth Circuit stated:

> This case at this stage is not *Brunswick,* it is not *Cargill,* it is not *Pool Water,* and it is not *Lucas Automotive.* In the *Brunswick* line of cases, the alleged 'injury' was simply a loss of greater profits caused by *increased* competition stemming from the alleged wrongful acts. Here, as the record now stands, there is *no* pro competitive aspect of the defendant's strategic alliance, none.... Moreover, whatever might have happened to [plaintiff], had some other event occurred resulting in the demise of [the defendant competitor], is irrelevant in this context. The strategic alliance set out to exterminate [the defendant competitor] and allegedly succeeded, leaving only one product, no choices, and no competition in its wake. Furthermore, this case is not strictly a merger case, or a case involving the simple discontinuation of a product line, or one involving the termination of a distributor.

*Id.* at 377. *See also id.* at 375.[2]

█ Here, as in *Glen Holly,* and unlike *Lucas* or *Brunswick,* there is no alleged procompetitive aspect to the challenged conduct. Retrophin alleges that it was foreclosed from using Synacthen to enter the Relevant Markets and compete with Questcor, and that as a result Questcor continues to maintain a monopoly in the Relevant Markets through Acthar. (Compl. ¶¶ 52, 56, 60, 61–63.)[3] Retro-

---

2. To the extent the Ninth Circuit held the plaintiff had alleged antitrust injury as a customer, the decision is not directly on point. *See id.* at 369, 374, 376–78. Nonetheless, the Court's interpretation of *Brunswick* and *Lucas* is relevant to whether Retrophin sufficiently alleges antitrust injury.

3. Questcor states in its Motion that it intends to use Synacthen for "new indications." (Mem. at 4, 23.) Whether or not this could be considered pro-competitive, it is not alleged in the Complaint.

phin's injury—exclusion from the Relevant Markets—is inseparable from the alleged harm to competition. Accordingly, the Court finds that Retrophin sufficiently alleges antitrust injury. *Accord Gulf States Reorganization Grp., Inc. v. Nucor Corp.,* 466 F.3d 961, 967–68 (11th Cir.2006) (potential competitor plaintiff demonstrated antitrust injury where it was foreclosed from entering market due to defendant monopolists' purchase of "substantially all of the assets necessary for a potential entrant into the market to begin operations and compete;" exclusion from market was "inseparable from the alleged harm to competition."); 2A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 391e, at 328 (3d ed. 2007) ("If an incumbent monopolist takes steps to maintain its monopoly by foreclosing a would-be rival from entering.... [b]oth consumers and foreclosed rivals suffer antitrust injury.").[4]

## 2. Other Factors

 As to the remaining factors—the directness of the alleged injury, the speculative measure of the harm, the risk of duplicative recovery, and the complexity of apportioning damages—Questcor argues only that the alleged harm is too speculative. (Mem. at 11–12.) In particular, Questcor argues that: (1) Retrophin does not allege it is "likely" it would have obtained Synacthen's FDA approval for Acthar's indications; (2) Retrophin does not allege Novartis would have licensed Synacthen to Retrophin if it did not license it to Questcor; and (3) the potential alternative entry path through RE–304 makes any injury speculative. ⹁(*Id.* at 12–17.)[5]

In making its argument as to the likelihood of FDA approval, Questcor relies on *Andrx Pharmaceuticals, Inc. v. Biovail Corp. International,* wherein the D.C. Circuit Court of Appeals *reversed* a district court's dismissal with prejudice of a pleading for failure to allege antitrust standing. *See* 256 F.3d 799, 806–07 (D.C.Cir.2001). The *Andrx* Court did not require the plaintiff to allege that FDA approval was certain; instead, it held that "[the plaintiff] *can* allege facts sufficient to indicate its intent and preparedness [to enter the market]. And even before the FDA approved [plaintiff's] ANDA, [plaintiff] could have alleged its intent and preparedness to enter the market by claiming that FDA approval was probable." *Id.* at 808 (citations omitted; emphasis in original).

 The Ninth Circuit has not specifically ruled on whether the absence of FDA approval indicates that any harm is too speculative to warrant finding antitrust standing. However, it "has held that a potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so." *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445, 450 (9th Cir.1985). In determining whether a potential competitor has standing, the Ninth Circuit considers "varying combinations of the following typical elements:" (1) the background and experience of the plaintiff; (2) affirmative action by the plaintiff to

4. Questcor also argues that it did not actually foreclose Retrophin from entering the Relevant Markets, because Retrophin could enter through RE–034. (Mem. at 10.) However, as explained in greater detail below, Retrophin alleges RE–034 is not on the market and may not ever make it to the market, (*see* Compl. ¶¶ 58, 60), and the Court will not resolve any factual dispute regarding this issue at this stage.

5. Questcor also argues in passing that Retrophin lacks Article III standing. (Mem. at 11.) Article III standing imposes a lower bar than antitrust standing. *Assoc. Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). As the Court finds Retrophin has antitrust standing, it also finds Retrophin has Article III standing.

engage in the proposed business; (3) the ability of plaintiff to finance the business; and (4) the consummation of contracts by the plaintiff. *See Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1310 (9th Cir. 1978).

Retrophin alleges it has "expertise as a biopharmaceutical company focusing on rare diseases" and was on the verge of signing an agreement with Novartis that had been nearly a year in the making. (Compl. ¶¶ 49, 52, 54.) Retrophin also alleges affirmative action to engage in the proposed business, not only by attempting to license Synacthen, but also by preparing a plan to obtain regulatory approvals for and sell Synacthen and putting in place an "apparatus to conduct clinical trials to obtain FDA approval." (*Id.* ¶¶ 50, 51.) Retrophin further alleges its belief "that the history of Synacthen's use in other countries would aid it in obtaining FDA approval." (*Id.* ¶ 50.) The Court finds that Retrophin has sufficiently alleged an intent and preparedness to enter the market, and that the necessity of FDA approval under these circumstances does not render the alleged harm too speculative.[6]

Questcor next argues that it is speculative that Retrophin would obtain Synacthen if Questcor had not. (Mem. at 14.) Retrophin allegedly negotiated with Novartis for nearly a year for the rights to Synacthen, and had reached an agreement that was to be signed on the same day Questcor "swept in" and acquired the rights to Synacthen from Novartis. (Compl. ¶¶ 49, 53–54.) There are no allegations that anyone else besides Questcor sought to acquire Synacthen. Drawing all reasonable inferences from the allegations

in Retrophin's favor, it is plausible that Novartis would have otherwise sold Synacthen to Retrophin. Thus, at this stage, this is not a basis to find the alleged harm too speculative.

Finally, Questcor argues that Retrophin had another path to compete with Questcor through RE–034. (Mem. at 14–17.) Questcor's argument primarily relies upon matters outside the pleadings which are not properly considered on this motion. Inasmuch as Questcor argues that Retrophin's alleged injury is too speculative because it is not clear Synacthen could be brought to market, it is even less clear that RE–034 could be brought to market, because, unlike Synacthen, RE–034 lacks decades of prior use and clinical data for the indications for which FDA approval would be sought. (*See* Compl. ¶¶ 59–60.) The mere possibility that RE–034 could one day make it to the market does not mean Retrophin alleges harm that is too speculative.

Accordingly, none of Questcor's arguments demonstrates that Retrophin has failed to allege antitrust standing. At most, Questcor has raised factual issues that are inappropriate to resolve at this stage. *Cf. Solinger*, 586 F.2d at 1310.

## C. Merits of Federal Antitrust Claims

The Court next addresses Questcor's arguments as to the merits of Retrophin's federal antitrust claims. Questcor argues that Retrophin fails to allege market or monopoly power, or harm to competition. (Mem. at 17.) Questcor also argues that

---

**6.** The Court grants Questcor's request for judicial notice of FDA publications in the Federal Register, which describe procedures and statistics regarding FDA approval. (*See* Mem. at 13–14); 44 U.S.C. § 1507. The Court nonetheless focuses on the allegations in Retrophin's Complaint, as opposed to generally-applicable facts about the FDA, in determining whether Retrophin has sufficiently alleged an intent and preparedness to enter the market.

Retrophin's attempted monopolization claim is inadequately pleaded, and that Retrophin fails to allege a lack of an adequate business justification by Questcor. (*Id.* at 21–24.)

### 1. Monopoly Power and Market Power

▇▇ Retrophin's section 1 Sherman Act claim requires that it establish Questcor's "market power," i.e., "the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Retrophin's section 2 Sherman Act claim for monopolization requires that it establish the "more stringent" standard of "monopoly power," i.e., the "power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Eastman*, 504 U.S. at 481, 112 S.Ct. 2072; 3B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 801 (3d ed.2007) (monopoly power requires "substantial" market power).

▇▇ Questcor argues it lacks market and monopoly power due to low entry barriers, and that there is no other direct or circumstantial evidence of such power alleged in the Complaint. (Mem. at 17; Reply at 14–17.) The Court finds that Retrophin fails to allege facts that, if true, could constitute direct evidence of market power, because Retrophin has not alleged prices above competitive levels, and even

if this were not the case, there are no allegations of restricted output. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995). However, Retrophin sufficiently alleges facts that, if true, could constitute circumstantial evidence of market power. "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a *dominant* share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* at 1434. Here, the first two requirements are sufficiently alleged and not directly challenged by Questcor. (Compl. ¶¶ 39, 42, 43.)[7] Questcor argues only that entry barriers are low, but it relies almost entirely on matters outside the pleadings and not properly subject to judicial notice. (*See* Mem. at 17–19.) Retrophin alleges that significant entry barriers exist due to (1) the difficulty of developing a new drug from scratch; (2) Questcor's "Orphan Drug Designation" for Infantile Spasms; and (3) the need for FDA approval. (Compl. ¶¶ 22–23, 26–28, 31–33, 57–60.) The Court finds it plausible that developing a new drug from scratch and bringing it to market presents a significant barrier to entry. *Cf. Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02–4770 MRP, 2004 WL 5907538, at *4 (C.D.Cal. June 10, 2004) (evidence of "significant up-front costs and lead times for research and development, to obtain FDA approval, and to achieve learning curve economies," among other things, was sufficient to withstand summary judg-

7. Questcor does not dispute Retrophin has sufficiently alleged relevant geographic and product markets, nor does Questcor directly challenge the sufficiency of Retrophin's market share allegations. (*See* Compl. ¶¶ 37–45). In light of these allegations, and the allegations as to barriers to entry, the Court finds

Retrophin plausibly alleges monopoly power. *Cf. Movie 1 & 2 v. United Artists Comm's, Inc.*, 909 F.2d 1245, 1254 (9th Cir.1990) ("[M]arket share is perhaps the most important factor to consider in determining the presence or absence of monopoly power.").

ment motion). Questcor's Orphan Drug Designation for Infantile Spasms could also be considered a barrier to entry to the Infantile Spasms Market. *See also Rebel Oil,* 51 F.3d at 1439. Ultimately, whether there are in fact significant barriers to entry is not an issue appropriately decided on this Motion. *Cf. Movie 1 & 2,* 909 F.2d at 1254–55.

## 2. Harm to Competition

 Section 1 of the Sherman Act requires that Retrophin allege conduct that "actually injures competition."[8] *See Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1197 (9th Cir.2012). "In order to plead injury to competition, the third element of a Section 1 claim, sufficiently to withstand a motion to dismiss, a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably. Rather, a claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail. Such allegations must raise a reasonable expectation that discovery will reveal evidence of an injury to competition." *Id.* at 1198 (alterations in original; citations and quotation marks omitted).

Questcor argues that Retrophin does not allege that FDA approval for Synacthen was likely, and therefore does not allege harm to competition. (Mem. at 19–20.) The Court rejects this argument for the reasons stated above.

Questcor also argues that Retrophin must allege that Novartis would have tried to enter the Relevant Markets absent the sale of Synacthen to Questcor. (*Id.* at 20.) This is incorrect. The harm to competition is based on Retrophin's allegation that *it* is a potential competitor who did not enter the Relevant Markets as a result of Questcor's conduct.

Finally, Questcor argues that any harm is too transient to sustain an antitrust violation. (Mem. at 20.) Questcor's argument is premised on Retrophin necessarily entering the Relevant Markets through RE–034. However, as discussed above, Retrophin alleges it may not ever enter the market through RE–034. Construing all allegations in a light most favorable to Retrophin, at this stage the harm alleged is more properly considered indefinite, not transient. *Cf. Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.,* 141 F.3d 947, 951–52 (9th Cir.1998) (where competitor entered market after four to ten month delay, competitive harm was too transient to be cognizable).

## 3. Attempted Monopolization

 Questcor next argues that Retrophin's claim for attempted monopolization under section 2 of the Sherman Act fails because Retrophin has already alleged actual monopolization. (Mem. at 21.) Questcor's argument evinces a fundamental misunderstanding of the "liberal pleading policy embodied in [Federal Rule of Civil Procedure 8]," which requires the Court not to construe a pleading "as an admission against another alternative or inconsistent pleading in the same case." *Aholelei v. Dept. of Pub. Safety,* 488 F.3d 1144, 1149 (9th Cir.2007) (quotation marks

---

8. The relief Retrophin seeks in connection with its Sherman Act section 2 claims and Clayton Act section 7 claim likewise requires Retrophin to allege some form of actual or prospective harm to competition. *See Cargill,* 479 U.S. at 113, 107 S.Ct. 484. *See also F.T.C. v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 651, at 119 (3d ed. 2007) ("The conduct that § 2 brands as anticompetitive must additionally cause or threaten harm to consumers from ... some ... indicator of diminished competitiveness.") [hereinafter "3 Areeda"].

omitted). *See also* Fed.R.Civ.P. 8(d) ("A party may set out [two] or more statements of a claim ... If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient ... A party may state as many separate claims or defenses as it has, regardless of consistency.").

### 4. Adequate Business Justification

■ Questcor additionally argues that Retrophin fails to allege the absence of an adequate business justification for Questcor's conduct. (Mem. at 23.) However, the initial burden is with Questcor to assert a business justification, not with Retrophin to demonstrate the absence of one. *Cf. Phonetele, Inc. v. Am. Tel. & Tel.*, 664 F.2d 716, 739 (9th Cir.1981). *See also Morris Comms. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir.2004) ("Once the defendant has met its burden to show its valid business justification, the burden shifts to the plaintiff to show that the proffered business justification is pretextual."). In any event, "the existence of valid business reasons is ordinarily a question of fact." *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir.1996).

### D. State Law Claims

■ Questcor also moves to dismiss Retrophin's state law claims for violation of the Cartwright Act and for violation of California Business & Professions Code section 17200. (Mem. at 23–25.) "The analysis under California's antitrust law mirrors the analysis under federal law because the [Cartwright Act] was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir.2001) (citations omitted). However, "[t]he Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2), and the Cartwright Act applies only to a 'combination' involving 'two or more persons' (§ 16720), not to *unilateral* conduct." *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 198 Cal.App.4th 1366, 1386, 131 Cal. Rptr.3d 519 (2011) (emphasis in original). *See also State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal.3d 1147, 1167, 252 Cal.Rptr. 221, 762 P.2d 385 (Cal. 1988) ("[T]he drafters of the Cartwright Act intended to make their law applicable only to situations in which the parties improperly collude *and* continue as separate, independent entities, and not to situations in which, by virtue of purchase and sale, or merger, one or more of the entities ceases to exist."). As stated above, Retrophin sufficiently alleges a violation of section 1 of the Sherman Act. Moreover, Retrophin alleges that Questcor acquired rights to Synacthen from Novartis—not that Questcor acquired Novartis itself—and the specific details of the transaction are not before the Court. The Court finds that, at this stage, Retrophin sufficiently states a claim under the Cartwright Act.

Retrophin's claim for violation of California Business & Professions Code section 17200 is derivative of Retrophin's other claims. (*See* Compl. ¶¶ 94–95.) Because Retrophin sufficiently alleges its other claims, it sufficiently alleges a violation of California Business & Professions Code section 17200 as well.

## V. CONCLUSION

For the foregoing reasons, Questcor's Motion is DENIED.

**SO ORDERED.**